**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **JARROD REED ERWIN,** | ) | **Case No. 23-31315** |
| | ) | **Chapter 13** |
| Debtor. | ) | |
| | ) | |
| **AFRICAN METHODIST EPISCOPAL CHURCH AND AMEC MINISTERIAL RETIREMENT ANNUITY PLAN** | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Adv. Pro. No. _____** |
| | ) | |
| **JARROD REED ERWIN,** | ) | |
| | ) | |
| Defendant. | ) | |

**AFRICAN METHODIST EPISCOPAL CHURCH AND AMEC MINISTERIAL RETIREMENT ANNUITY PLAN'S ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT**

COME NOW African Methodist Episcopal Church and AMEC Ministerial Retirement Annuity Plan (collectively, "AMEC"), by and through the undersigned counsel, and file this *Complaint to Determine Dischargeability of Debt* ("Complaint") against Debtor Jarrod Reed Erwin ("Debtor") pursuant to 11 U.S.C. § 523.  In support of this Complaint, AMEC respectfully states as follows:

**JURISDICTION AND THE PARTIES**

1. This Court has jurisdiction over the subject matter and parties to this action pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.  This is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A), (B), (I), (J), and (O).  This Court has the power and authority to enter a final order in this proceeding.

2.      Debtor is an individual who, at the time of the filing of this voluntary Chapter 13 bankruptcy proceeding, on April 7, 2023 ("Petition Date"), was, upon information and belief, a resident of Sugar Land, Fort Bend County, Texas.

3.      Service may be obtained on the Debtor by mailing a copy of the summons and Complaint to the to the Debtor at the address shown on his petition and by service, first class mail, and on Debtor's attorney pursuant to Fed. R. Bankr. P. 7004(b)(9) and (g).

4.      AMEC is, and was at all relevant times, an unincorporated nonprofit religious association existing under the laws of the state of Pennsylvania.

5.      AMEC Ministerial Retirement Annuity Plan is a retirement plan of the Church.  It was designed to provide annuity coverage for the salaried personnel of the Church.  The Plan is a 401(a) Plan, and AMEC contributes an amount equal to a percentage of the annual salary of each enrolled participant into the Annuity Plan.

6.      AMEC is a creditor of Debtor, as further described herein, and has standing to bring this action pursuant to 11 U.S.C. § 523.  AMEC also seeks a money judgment against Debtor as more particularly set forth herein.

**BACKGROUND FACTS**

A.      **The Tennessee Case.**

1.      On August 19, 2022, Reverend Pearce Ewing and others ("Tennessee Plaintiffs") filed a consolidated Amended Complaint in the United States District Court for the Western District of Tennessee ("Tennessee District Court") as Case No. 1:22-md-03035-STA-jay ("Tennessee Case") against the following Defendants: African Methodist Episcopal Church

Ministerial Retirement Annuity Plan, Newport Group, Inc., Symetra Life Insurance Company, Rev. Dr. Jerome V. Harris, AMEC, AMEC Department of Retirement Services, AMEC General Board, AMEC Council of Bishops, Bishop Samuel L. Green, Sr., Bishop James Davis, Robert Eaton, Financial Freedom Funds, LLC, Financial Freedom Group, Inc., Financial Technologies, LLC, Motorskill Venture Group, Motorskill Ventures 1, L.P., Motorskill Asia Venture Group, Asia Ventures 1, L.P., Jarrod Erwin, Randall Erwin, Rodney Brown and Company, Doe Corporations 1-10, and John Does 1-10, (collectively, the "Tennessee Defendants"). The Tennessee Plaintiff brought claims for breach of fiduciary duties and negligent conduct, among other claims, and sought recovery on behalf of AMEC ministers and other employees.

2.      In response to the complaint filed in the Tennessee Case, AMEC filed its Answer on October 18, 2022, naming, among others, Debtor as a Cross-Defendant.

3.      The Cross-Complaint was brought after it was discovered by AMEC that that Dr. Harris, former Executive Director of the AMEC Department of Retirement Services, allegedly engaged in a conspiracy with several individuals and/or entities (including the Debtor herein) to embezzle funds and defraud AMEC by, among other things, providing AMEC with deceptive, false, and grossly inflated financial statements for the African Methodist Episcopal Church Ministerial Retirement Annuity Plan.

4.      On February 20, 2023, AMEC filed its Motion for Leave to File First Amended Partial Answer and Cross-Complaint ("Motion for Leave") to correct certain scrivener's errors, and to allege additional facts, to add Symetra Financial Corporation as a third-party defendant, and to assert additional claims for negligence against Cross-Defendants Symetra Life Insurance Company ("Symetra Life") and Newport Group, Inc. ("Newport"). The Tennessee District Court granted AMEC's Motion for Leave on June 22, 2023.

5.      AMEC filed its First Amended Partial Answer of AMEC Defendants to Consolidated Amended Complaint, Cross-Complaint, and Third-Party Complaint (the "Cross-Complaint") on July 25, 2023, which intentionally omitted AMEC's previously asserted claims against Debtor.  AMEC removed all claims originally filed against the Debtor as a result of Debtor's current Chapter 13 bankruptcy case.  A more detailed version of the facts giving rise to AMEC's cause of action against the Debtor are included in the Cross-Complaint, a true and correct copy of which is attached hereto as **Exhibit 1**.  However, a brief summary of the events relevant to the Debtor's involvement are included herein.

**B.      Debtor's Involvement In Fraud Against AMEC And Events Giving Rise To The Tennessee Case.**

6.      In September 2021, AMEC discovered that Harris, former Executive Director of the AMEC Department of Retirement Services, engaged in a conspiracy with several individuals and/or entities to embezzle funds and defraud AMEC by, among other things, providing AMEC with deceptive, false, and grossly inflated financial statements for the African Methodist Episcopal Church Ministerial Retirement Annuity Plan.

7.      Harris was elected to the position of Executive Director of the AMEC Department of Retirement Services (the "Department") in July of 2000, and he served sequential 4-year terms through and including 2021.

8.      The Department of Retirement Services executes the Ministerial Annuity Plan of the African Methodist Episcopal Church (the "Annuity Plan" or "the Plan") that provides annuity coverage for the salaried personnel of AMEC. The Annuity Plan is a 401(a) Plan, and AMEC contributes an amount equal to a percentage of the annual salary of each enrolled participant into the Annuity Plan.

9.      All eligible and enrolled participants in the Annuity Plan are entitled to distributions pursuant to a Vesting Schedule. Upon official retirement or separation from active service, eligible and officially enrolled participants are eligible to receive the total amount of funds vested in their name, plus accrued interest. Eligible and officially enrolled participants are also permitted to seek disbursements related to hardship.

10.     Harris, as Executive Director, provided reports to the AMEC Commission on Retirement Services of the General Board. The Commission receives an annual report from the Executive Director and provides this report to the AMEC General Board.   AMEC has since learned that these reports have been intentionally deceptive, false, and grossly inflated.

11.     In 2001, Harris began what would become a long-running conspiracy to, among other things, defraud and steal from AMEC. This conspiracy involved Robert Eaton ("Eaton"), Debtor, Randall Erwin, and several other individuals and/or entities.  The facts pertinent to Debtor are included herein, while other surrounding facts are found in the Cross-Complaint, attached as Exhibit 1 hereto and is incorporated herein.

12.     In 2021 and upon the expiration of his term as Executive Director, Harris retired from his position. AMEC elected a new Executive Director at the 2021 General Conference in June 2021.  During the transition to new department leadership, the newly elected Executive Director uncovered financial irregularities in the AMEC's retirement fund investments. After discovering the financial irregularities, AMEC immediately conducted an independent and comprehensive investigation.

13.     As a result of the recent investigation, AMEC discovered at various times since 2001, Harris, upon consultation with Eaton and related entities, invested millions of dollars from the Annuity Plan into high-risk investments. Harris likewise loaned Department and/or Annuity

Plan funds to various entities and individuals without authorization from AMEC. These investments were made by Harris without the knowledge (and accordingly, without consent) of AMEC General Board, the AMEC Commission on Retirement Services, or any other AMEC bodies or officers.

14.     High-risk investments include, among others, Motorskill Venture Group, Motorskill Ventures 1, LP; Motorskill Asia Venture Group; and Motorskill Asia Ventures 1, LP; (collectively, "Motorskill Entities").  At no time was the AMEC General Board, the AMEC Commission on Retirement Services, or any other AMEC bodies or officers advised of these high-risk investments nor did the General Board, the AMEC Commission on Retirement Services, or any other AMEC bodies or officers provide any express or implied consent or approval whatsoever of such investments.

15.     Randall "Doc" Erwin ("Doc Erwin") served as the Motorskill Entities' representative to Harris and entered various investment-related agreements with Harris. Debtor, Doc Erwin's son, later took over all business dealings between Dr. Harris and Motorskill Entities

16.     Beginning in 2005, Harris directed Annuity Plan funds to Motorskill Entities. These transactions were largely accomplished by electronically wiring funds from the Department's bank account to Motorskill Entities.  Harris also submitted written requests that Symetra electronically wire Annuity Plan funds to Motorskill Entities, which Symetra did.  From 2005 to 2021, Harris via Department and/or Annuity Plan funds paid about $37 million dollars to Motorskill Entities.

17.     At various times between 2005-2021, Debtor, Doc Erwin, and/or the Motorskill Entities provided deceptive and false valuations of Department and/or Annuity Plan investments in Motorskill Entities that grossly inflated such investments by tens of millions of dollars.

18.     Upon information and belief, the Motorskill Entities stopped providing quarterly financial statements in 2019.

19.     Harris learned on June 11, 2021 that Motorskill Ventures 1, LP was terminating and that there was nothing of meaningful value remaining in the Fund save an 11% membership interest in Day and Night Solar, LLC, a company created by Eaton. While the value of this 11% membership interest is unknown, it is believed to be substantially less than the millions of dollars Harris invested in Motorskill Entities.

20.     As of the date of this Complaint, AMEC has not been able to ascertain what happened to the $37 million that was diverted from the Plan to Debtor and the Motorskill Entities.

21.     Prior to election of the newly elected Executive Director, AMEC was unaware of the fraudulent acts of Harris, Eaton, Debtor, or Doc Erwin and others.  The investigations remain ongoing.

## CAUSES OF ACTION

## COUNT I - CONVERSION

22.     AMEC repeats and realleges the facts asserted in the foregoing paragraphs as if fully restated herein.

23.     Debtor appropriated AMEC's property for his own personal use and benefit vis-à-vis his involvement in the Motorskills Entities.

24.     Debtor intentionally exercised dominion and control of AMEC's property by, among other things, engaging in self-dealing and misappropriating funds from the African Methodist Episcopal Church Ministerial Retirement Annuity Plan.

25.     Debtor, along with his co-conspirators, intentionally exercised dominion and control of AMEC's property by, among other things, using funds from the African Methodist Episcopal Church Ministerial Retirement Annuity Plan to enrich himself and his co-conspirators.

26.     Debtor's actions, as set forth herein, were in defiance of AMEC's rights under the Plan.

27.     AMEC avers that the actions of Debtor constitute the tort of actual or constructive conversion of its tangible property. As a direct and proximate result of these actions, AMEC has suffered damages, which include, but are not limited to, actual monetary loss and other direct and indirect consequential damages in an amount to be proven at trial. Debtor's actions were deliberate, intentional, and willful thereby entitling AMEC to punitive damages.

## COUNT II – FRAUDULENT MISREPRESENTATION

28.     AMEC repeats and realleges the facts asserted in the foregoing paragraphs as if fully restated herein.

29.     Debtor represented that the Annuity Plan's investments in the Motorskills Entities were conservative and prudent.

30.     Debtor represented that the Annuity Plan assets were substantially higher than its actual value.

31.     Debtor knew these representations regarding the Annuity Plan and its assets were false when they were made or did not believe them to be true.

32.     Alternatively, Debtor made such representations recklessly without knowing or taking reasonable steps to verify whether the representations were true or false.

33.     AMEC did not know such representations were false when made and was justified in relying on those representations as truth.

34.     As a direct and proximate result of these actions, AMEC has suffered damages, which include, but are not limited to, actual monetary loss and other direct and indirect consequential damages in an amount to be proven at trial.

## COUNT III – FRAUDULENT CONCEALMENT

35.     AMEC repeats and realleges the facts asserted in the foregoing paragraphs as if fully restated herein.

36.     Debtor concealed or suppressed material facts regarding the Annuity Plan's assets and investments.

37.     Debtor was under a duty to disclose such facts to Harris and/or AMEC.

38.     Debtor intentionally concealed or suppressed the fact with the intent to deceive AMEC.

39.     AMEC did not know such facts were concealed and/or suppressed and would have acted differently if it had known of the concealed or suppressed facts.

40.     As a direct and proximate result of these actions, AMEC has suffered damages, which include, but are not limited to, actual monetary loss and other direct and indirect consequential damages in an amount to be proven at trial.

## COUNT IV – CIVIL CONSPIRACY

41.     AMEC repeats and realleges the facts asserted in the foregoing paragraphs as if fully restated herein.

42.     Debtor engaged in fraud.

43.     There exists a common design between Debtor and other individuals, including Harris, each having the intent and knowledge of the other's intent.

44.     There exists a common design between Debtor and other individuals, including Harris, to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means.

45.     Debtor committed overt acts in furtherance of the conspiracy.

46.     As a direct and proximate result of these actions, AMEC has suffered damages, which include, but are not limited to, actual monetary loss and other direct and indirect consequential damages in an amount to be proven at trial.

### COUNT V – NEGLIGENT MISREPRESENTATION

47.     AMEC repeats and realleges the facts asserted in the foregoing paragraphs as if fully restated herein.

48.     Debtor was acting in the course of his business, profession, or employment with the Motorskills Entities.

49.     Debtor supplied and/or should have supplied information to AMEC meant to guide its business transactions.

50.     Debtor falsely supplied or omitted and/or did not exercise reasonable care in obtaining or communicating information to AMEC.

51.     AMEC justifiably relied on the information provided by Debtor.

52.     As a direct and proximate result of these actions, AMEC has suffered damages, which include, but are not limited to, actual monetary loss and other direct and indirect consequential damages in an amount to be proven at trial.

### COUNT VI – AMEC'S CLAIMS ARE NON-DISCHARGEABLE PURSUANT TO 11 U.S.C. § 523(a)(2)

53.     AMEC repeats and realleges the facts asserted in the foregoing paragraphs as if fully restated herein.

54.     AMEC's claims against Debtor, as described herein, are for money paid to or for the benefit of the Debtor through false pretenses, false representations, and/or actual fraud.[1]

55.     Debtor actually obtained financial benefits and/or other property from AMEC through false pretenses, false representations, and/or actual fraud when Debtor assured Harris and/or AMEC that the investments in the Motorskills Entities were conservative and prudent.

56.     AMEC reasonably and justifiably relied upon the false and fraudulent misrepresentations of the Debtor.  Accordingly, as a direct result of Debtor's misrepresentations, including material misrepresentations regarding use of the financial health and stability of the investments in the Motorskills Entities, AMEC has suffered substantial damages.

57.     Debtor engaged in such fraudulent activities with the actual intent to deceive.

58.     To date, Debtor has not provided any information with respect to what happened to the $37 million investments from AMEC.

59.     Based upon the facts stated herein and to be established at trial, AMEC's claim against the Debtor should be held to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

**COUNT VII - AMEC'S CLAIMS ARE NON-DISCHARGEABLE PURSUANT TO 11 U.S.C. § 523(a)(4)**

60.     AMEC repeats and realleges the facts asserted in the foregoing paragraphs as if fully restated herein.

61.     Debtors' intentional actions and conduct in taking AMEC's investment funds constitutes larceny resulting in permanently depriving AMEC of its property, namely, the investment funds.

---

[1]     Section 523(a)(2)(A) does not discharge a debtor from any debt "obtained by . . . false pretenses, a false representation, or actual fraud."  The "obtained by" language in § 523(a)(2)(A) does not necessarily require that a debtor personally receive money before the exception to discharge applies, so long as the debtor receives a benefit from the transaction he induced.  *In re Vega*, 2014 WL 2621118, at *3 (Bankr. M.D. Fla. 2014).

62.     Debtor dishonestly took property for the purpose of converting it to their own.  Such conduct and actions by the Debtor constitute embezzlement and/or conversion.

63.     Based upon the facts stated herein, Debtor's conduct and actions therefore violate 11 U.S.C. § 523(a)(4) and, consequently, AMEC's claim should be held to be nondischargeable pursuant to 11 U.S.C. §523(a)(4).

## DEMAND FOR MONEY JUDGMENT/ALLOWANCE OF CLAIM

64.     AMEC repeats and realleges the facts asserted in the foregoing paragraphs as if fully restated herein.

65.     Based upon all of the foregoing, AMEC demands judgment against Debtor and allowance of its claims for debt incurred by the false and fraudulent acts in an amount to be proved at trial, but no less than $37 million, plus interest, costs, and attorneys' fees for this action.  See Proofs of Claim Nos. 6 and 7.

WHEREFORE, ABOVE PREMISES CONSIDERED, AMEC prays that this Court enter an order (a) determining that AMEC's claims against Debtor are nondischargeable pursuant to 11 U.S.C. § 523; (b) for judgment against the Debtor in an amount not less than $37 million, plus interest and costs, including reasonable attorneys' fees, incurred in this action; (c) and for all other just and proper relief that the Court deems appropriate under the circumstances.

Respectfully submitted, this the 8th day of August, 2023.

By: */s/ Daniel J. Ferretti*
**DANIEL J. FERRETTI**
Texas Bar No. 24096066
Email: dferretti@bakerdonelson.com
**BAKER, DONELSON, BEARMAN**
**CALDWELL & BERKOWITZ, P.C.**
1301 McKinney, Suite 3700
Houston, Texas 77010
Phone:  713.650.9700
Fax:  713.650.9701

*Counsel for AMEC*